THIS DISPOSITION IS CITABLE
AS PRECEDENT OF THE TTAB

Mailed:
August 18, 2005

# UNITED STATES PATENT AND TRADEMARK OFFICE

## Trademark Trial and Appeal Board

Blue Man Productions, Inc.

v.

Erich Tarmann

Opposition No. 91154055
to application Serial No. 76295724
filed on August 6, 2001

Robert W. Clarida and Antonio Borrelli of Cowan, Liebowitz & Latman, P.C. for Blue Man Productions, Inc.

Lawrence Harbin and Amy M. Jones-Baskaran of McIntyre, Harbin & King LLP for Erich Tarmann.

Before Seeherman, Bucher and Holtzman, Administrative Trademark Judges.

Opinion by Seeherman, Administrative Trademark Judge:

Blue Man Productions, Inc. has opposed the application of Erich Tarmann, an Austrian citizen, to register BLUEMAN as a trademark for "tobacco, smokers' articles, namely cigarettes."[1] As grounds for opposition, opposer has

---

[1] Application Serial No. 76295724, filed August 6, 2001, and asserting first use and first use in commerce on March 6, 2000.

alleged that since prior to March 6, 2000, applicant's claimed date of first use, opposer has used the mark BLUE MAN GROUP in connection with a wide variety of goods and services, and that it owns registrations for BLUE MAN GROUP for "gift items, namely decorative magnets; paper goods, namely, postcards and posters; apparel, namely hats, T-shirts, sweatshirts";[2] and for BLUE MAN GROUP, with the word GROUP disclaimed, for "entertainment services in the nature of live musical and theatrical performances"[3] and for "musical sound recordings";[4] that opposer owns pending applications for BLUE MAN GROUP for mugs, watches and ornamental pins, jackets and caps, and prerecorded videos; that as a result of extensive promotion of goods and services bearing its mark, opposer has built up goodwill for its mark, and its advertising and promotional efforts have brought the mark high recognition and visibility among consumers; that the mark has achieved widespread fame; that applicant's use of BLUEMAN is likely, when applied to applicant's goods, to cause confusion, mistake and to deceive; and that opposer's mark was famous and distinctive prior to applicant's claimed date of first use, and that

---

We read the identification as being for tobacco and for smoker's articles, namely cigarettes.
[2]  Registration No. 2438222, issued March 27, 2001.
[3]  Registration No. 2450660, issued May 15, 2001.
[4]  Registration No. 2617550, issued May 10, 2002.

applicant's BLUEMAN mark will dilute the distinctive quality of opposer's BLUE MAN GROUP mark.[5]

Applicant has denied the salient allegations of the notice of opposition in his answer.

**The Record**

By operation of the rules, the record includes the pleadings and the file of the opposed application. Opposer has also made of record its pleaded registrations by submitting certified status and title copies of them. Opposer has also submitted, under notice of reliance, a large number of printed publications/materials and tapes of television broadcasts and other video recordings. Applicant moved to strike these materials for various reasons, which motion was opposed by opposer. Decision on the motion was deferred until final hearing, and we therefore turn to it now.

Applicant objected to some of the materials, in particular press releases, Internet pages and videos of television broadcasts, on the basis that they are not printed publications that may be submitted under a notice of reliance and/or that they are not self-authenticating. In

---

[5] Opposer also alleged that applicant's mark would falsely suggest a connection between applicant's mark and opposer. However, it is clear from opposer's brief, which states that the only two grounds at issue are likelihood of confusion and dilution, that opposer was not attempting to assert a claim under Section 2(a) of the Act.

its response to the motion, opposer stated, inter alia, that "to the extent that any of these documents do not qualify on their face as 'printed publications,' Opposer will show in its rebuttal testimony period, which has yet to begin, that such publications otherwise qualify as 'printed publications' under Rule 1.222(e)[sic, should be 2.122(e)]."

During its rebuttal testimony period opposer took the testimony of Laura Camien, its marketing director, who testified that a service called Video Monitoring Service provides a report listing any mentions of BLUE MAN GROUP on television, and that opposer can obtain cassettes from this service, or from another company, of such appearances. She also testified that print mentions are provided to opposer by a clipping service, which monitors both domestic and foreign publications. She explained that some of the clippings might bear handwritten indications of the source of the article, and that this is done by the clipping service. Ms. Camien also explained that two other services keep track of mentions of BLUE MAN GROUP on the Internet, and that if opposer itself is not able to find the actual article on a website, it would obtain a copy from the service and keep it with opposer's business records.

We should mention at this point that applicant submitted no testimony, so therefore any rebuttal testimony by opposer would be inappropriate. Rebuttal testimony

cannot normally be used to supplement any inadequacies in the plaintiff's main trial testimony.  However, we have a somewhat odd situation in this case, in that applicant filed a consented motion "to extend opposer's rebuttal testimony period to July 23, 2004."  This motion was signed by applicant's counsel on July 8, 2004, after applicant's testimony period had closed and at the point that opposer's rebuttal testimony period had already opened.  Thus, applicant was aware that he had not submitted any testimony when he consented to an extension of opposer's rebuttal testimony period.  We therefore deem applicant's request for an extension of opposer's rebuttal testimony period to be a consent to the inclusion in the record of the testimony deposition, with exhibits, of Laura Camien, taken on July 15, 2004.

Ms. Camien's testimony does not, in general, authenticate specific exhibits.  In fact, for many of the exhibits, opposer's <u>attorney</u> stated that he was identifying them.[6]  However, we find that the testimony is sufficient to identify how opposer obtained the various clippings.  Therefore, although such materials as videocassettes and

---

[6]  See, for example, the following:  Opposer's attorney:  "I would like to show you what I marked as Opposer's Exhibit 3, and I'll identify this as a one-page press clipping on Blue Man Group letterhead, with a tag or slag with—with a bar code indicating that it's from Burrelle's Information Services.  Could you tell me what Burrelle is?"  p. 10.  The response dealt only with Burrelle's, and not the particular exhibit.

5

website materials would not be suitable for a notice of reliance, because Ms. Camien's testimony has adequately authenticated them, we deem them to be of record. Similarly, although some of the newspaper articles bear notations from the clipping service as to their source and date rather than from the actual publication, we find them to be authenticated, as we do those clippings that have been pasted onto opposer's letterhead.

Applicant has raised certain other objections to the notice of reliance. Applicant has asserted that it was untimely. This is not correct. The notice of reliance was timely filed with the Board on January 21, 2004, within opposer's testimony period which closed on January 22, 2004. Applicant also asserts that opposer did not indicate the relevance of the identified material, as required by Trademark Rule 2.122(e). This is also not correct. The notice of reliance states that "these printed publications and broadcasts are offered to show that Opposer's mark BLUE MAN GROUP, used in connection with entertainment services and related merchandise, have [sic] been the subject of numerous articles and broadcasts in publicly circulated media." Although it would certainly have been more helpful to the Board if opposer, for each article and video clip, had specified the information it considered probative and the reason therefor, in order to direct the Board's

6

attention to that point, we find the general statement by opposer to be a sufficient statement of the relevance of this material.

Applicant has also objected to the material submitted under notice of reliance on the ground of hearsay. Printed publications or broadcast news reports would be hearsay if they were offered to prove the truth of the statements made therein, and to the extent that opposer seeks to rely on them as evidence of the statements made in the articles or broadcasts, applicant's objection is well taken. However, they are acceptable to show that the stories have been circulated to the public. See Hard Rock Cafe Licensing Corp. v. Elsea, 48 USPQ2d 1400 (TTAB 1998). Thus, we have considered these documents and the videocassettes only for that purpose.[7]

Because there are literally hundreds of documents, and multiple excerpts of programs recorded on the various videocassettes, we will not discuss each one here. Further, because opposer has not separately numbered these exhibits, we cannot easily group them by referring to them by number, and it would make this opinion unduly long if we were to list each of them by the name of publication (or program)

---

[7] The video submissions showing performances by opposer are, however, evidence of opposer's rendering of its performing services, and they are also evidence of television commercials in which opposer appears or which advertise opposer's goods or services.

and date.  Thus, we will refer to certain exhibits as examples of more general problems.

In addition to the hearsay problem noted above, some of the materials have limited or no probative value.  For example, a large number of the articles submitted by opposer are in a foreign language; not only can we not understand the articles, but there is no indication that they (or the English language articles that are from foreign publications) have been circulated in the United States, and therefore they are of no probative value in terms of showing recognition by the relevant consuming public.  Hard Rock Cafe Licensing Corp. v. Elsea, supra.  Some of the exhibits have been submitted in duplicate.  In particular, opposer has separately submitted the covers and the articles that appeared in the particular periodicals, so that the list of documents in the notice of reliance is greater than the actual number of articles in which the mark appears.  Similarly, some of the video excerpts have been submitted in duplicate and separately listed in the notice of reliance (for example, the appearance on "The Tonight Show" in 1997, and the appearance on the "Grammy Awards" show).  Further, some of the covers and articles and television excerpts do not refer to the mark BLUE MAN GROUP at all.  See, for example, the articles in "Esquire" February 1992 (performance group is referred to as "Blue Man"); "PR Week,"

8

March 18, 2002 (photo of performers, no mention in article of mark BLUE MAN GROUP); the cover of "Travelocity" March/April 2001 (only a photo of three people with blue heads and hands); the cover of "Improper Bostonian" May 1-14, 2002 (photo of three people with blue heads, text "How to be a Blue Man"); and the television clip for "Las Vegas" January 6, 2004 (costumed blue-colored characters shown doing various things, but the mark BLUE MAN GROUP is not mentioned).

Moreover, some of the submissions are clearly only excerpts from larger articles, e.g., "Philadelphia City Paper," August 7, 2003 (portion of paragraph in article headlined "icepack" in which appears the sentence, "They also tackle backstage foodstuffs for DFC, like recent gigs with Blue Man Group and **Jane's Addiction**." emphasis in original); "Greenwich Time (Greenwich, CT)," August 3, 2003 (article headlined "This week off-Broadway" of which the only portion submitted is a listing for "'Blue Man Group' They paint each other. They paint the audience. They unroll toilet paper. Foreign tourists love this long-running new vaudeville show. Astor Place. Ticketmaster."). Because these submissions do not show the reference to BLUE MAN GROUP in context, we cannot ascertain what impact these articles may have had on the consuming public.

There are certain other materials submitted by opposer that are inappropriate for a notice of reliance, and that were not separately authenticated by opposer's witness. They include, for example, a letter dated January 7, 1998 from Guides Gallimard to Blue Man Group; what appears to be an advertisement, without any indication of source, for a performance at The Performing Garage; what appears to be a train schedule; a theater program; and pages from something described as "The Game & Guide That Capture The City!" Further, we have given no probative value to those articles or clippings which do not indicate their source or their date. We point out that opposer was placed on notice that there were deficiencies in its submissions under the notice of reliance, and that Ms. Camien's "rebuttal" testimony was specifically designed to cure those deficiencies. Particularly under these circumstances opposer had a clear obligation to cure any deficiencies. As for the press releases submitted under notice of reliance, Ms. Camien testified that opposer generates press releases and, if a publication on the press list is interested in a release, it will run it. In view of this, to the extent that opposer submitted any press releases, we have considered them only if it is clear that they appeared in a publication. Finally, some of the video clips which appear on the cassettes submitted by opposer are not listed in the notice

of reliance.  Because the purpose of Ms. Camien's "rebuttal" testimony was essentially to cure any deficiencies in the notice of reliance, we do not consider her general testimony regarding opposer's use of a video clipping service as sufficient to make of record excerpts which were not identified during opposer's main testimony period.  Thus, video clips which were not listed in opposer's notice of reliance or in Exhibit 2 to her testimony have not been considered.  This includes a segment of what appears to be an interview with Charlie Rose.

We grant applicant's motion to strike to the extent that we have not considered the materials submitted with opposer's notice of reliance that are not self-authenticating (and therefore are not acceptable as printed publications under Trademark Rule 2.122(e)), or that have not been authenticated by opposer's witness.

As part of his motion to strike opposer's notice of reliance, applicant also moved to dismiss the opposition for failure to prosecute, based on the assumption that his motion to strike opposer's notice of reliance would be granted, and his position that the pleaded registrations submitted by opposer under notice of reliance are not sufficient to show that opposer has a right to relief.  See Trademark Rule 2.132(b).  Because the Board deferred a decision on the motion to strike until final hearing, it

11

denied the motion to dismiss on the basis that it was
premature.  Applicant also moved for summary judgment; this
motion was denied as untimely, as it was filed by applicant
at the beginning of his testimony period, rather than before
trial commenced.  Although opposer has, in its brief,
referred to some of the assertions made by applicant in his
motion to dismiss/motion for summary judgment, we do not
deem opposer to have stipulated to these assertions as
facts.  Further, any evidence submitted with such motions is
not of record, as applicant did not submit any evidence
during trial, and mere statements made in a motion do not
constitute evidence.

Only opposer filed a brief.  Neither party requested an
oral hearing.

**Facts**

As noted above, applicant has not properly made any
evidence of record, and we therefore do not know anything
about him or his activities.  Moreover, since there is no
evidence of applicant's use, even though his application is
based on Section 1(a) of the Trademark Act, the earliest
date on which he can rely is August 6, 2001, the filing date
of his application.

As for opposer, as we have previously stated, the
various articles or broadcast reports submitted under notice
of reliance cannot be used as evidence of the "facts" stated

therein. Thus, many of the facts asserted by opposer in its brief have no evidentiary support. For example, opposer states that "the BLUE MAN GROUP mark has sold more than seven million theater tickets in the U.S.," brief, p. 5, citing to an article in the "Pittsburgh Post-Gazette," but any statements made in this article about opposer's sales are hearsay. Similarly, characterizations of opposer as "world famous," taken from "Official City Guide," do not prove that opposer, or the mark BLUE MAN GROUP, is famous.[8] At most, the latter characterizations can only be considered as the author's view (or that of the press release on which the article was based).

It has been difficult to ascertain facts about opposer and its activities because opposer did not submit any narrative testimony. The testimony of Ms. Camien was very limited, and was essentially directed to authenticating the materials submitted with opposer's notice of reliance. Thus, there is no testimony about what goods or services opposer offers under the mark BLUE MAN GROUP. Further, the notice of reliance under which the "printed publications"

---

[8] Opposer also asserted in its brief, as it did in its notice of opposition, that it owns pending applications for BLUE MAN GROUP for additional goods. However, opposer did not submit evidence of ownership of such applications, so the statement in its brief has no support. Submission of an application has no probative value other than to show that the application was filed, so the failure to make the applications of record has no effect on our decision herein. We merely point this out as another example of the unsupported statements made by opposer in its brief.

13

were submitted does not highlight the particular evidentiary value of each document; rather, opposer has simply presented the Board with four expandable folders of documents and videocassettes, and let the Board search through them for any information that the Board might consider pertinent.

Based on the materials submitted under notice of reliance or otherwise authenticated by Ms. Camien, we can conclude that the term BLUE MAN GROUP has appeared in various articles and other published and broadcast forms, and identifies a performing group. The entertainment services rendered by these performers are, as shown by the video excerpts, a combination of music, movement, comedy, audience participation, and perhaps performance art. Ms. Camien identified a flyer in which "The Blue Man Group invites you to be a part of a Happening Sunday, May 22, 1988" in New York's Central Park.[9] We consider this flyer acceptable evidence of use of the mark for entertainment services as of that date. There are also video clips showing appearances of the BLUE MAN GROUP performers on programs such as "A Closer Look," and the "Tonight Show." These clips evidence musical/comedy entertainment services

---

[9] Several times in its brief, which was filed in September 2004, opposer asserts that the mark BLUE MAN GROUP has been used "over the last twenty-five years," and that numerous articles featuring opposer have circulated during this time. However, opposer has pointed to no articles or documents dated earlier than 1988, nor have we found any in our review of the extensive group of exhibits.

under the mark as early as 1991, and continuing through 2003. Advertisements in the video clips indicate that the show BLUE MAN GROUP has appeared in New York and Boston.

The record also shows that there have been a large number of references to BLUE MAN GROUP as a performing group in both consumer and trade publications. Some of the articles submitted by opposer feature BLUE MAN GROUP; others simply mention the name in passing.

The evidence regarding opposer's advertising efforts is rather limited. Opposer has provided no figures regarding its advertising expenditures. The only testimony about its advertising is from Ms. Camien, and it centers on one advertisement that appears on a large electronic billboard in New York City's Times Square. The advertisement consists of some photos of the performers, followed by the name BLUE MAN GROUP and Astor Place Theatre. The ad, which appears three times an hour from 9 AM until 1 AM, began running in late 2002 or the beginning of 2003, and was still running as of the time of Ms. Camien's testimony in July 2004.[10] Ms. Camien also testified that, in addition to this single billboard in New York, opposer has "several billboards in

---

[10] One frame of this ad says "New Album in Stores Now" (although if there is any additional wording or a photo in this frame, it is not visible in the exhibit). Thus, we cannot determine if the advertisement is for the word mark BLUE MAN GROUP for records. It also appears, since the frame refers to a new album, that it was not part of the advertisement during the entire time that the advertisement has run.

Las Vegas, Boston, Chicago." p. 14. In addition, commercials showing that opposer was performing at the Astor Place Theatre in New York and at Charles Playhouse in Boston aired during the episode of "The Tonight Show" in which opposer appeared in 1997. Although not specifically advertisements for the performance services, the performers are featured in television advertisements for Intel's Pentium processors.

## Analysis

## Standing

Opposer has submitted copies of its registrations for BLUE MAN GROUP, and has also shown that it renders musical/comedy entertainment services under the name BLUE MAN GROUP. Therefore, it has established its standing.

## Priority

First, we note that, because opposer has made its pleaded registrations of record, priority is not in issue. King Candy Company v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974). Moreover, the evidence of record shows that opposer advertised a performance under the mark BLUE MAN GROUP in 1988, and performed in broadcast television appearances as early as 1991, well before the August 6, 2001 filing date of applicant's application which,

16

as we previously stated, is the earliest date on which applicant can rely.[11]

## Likelihood of Confusion

With respect to the issue of likelihood of confusion, our determination of this issue is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). See also, In re Majestic Distilling Company, Inc., 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003).

We turn first to the factor of fame, because this factor plays a dominant role in cases featuring a famous or strong mark. Kenner Parker Toys Inc. v. Rose Art Industries, Inc., 963 F.2d 350, 22 USPQ2d 1453 (Fed. Cir. 1992). Initially, we point out that, to the extent that any fame attaches to opposer's mark, it is in connection with opposer's live musical and theatrical performances. There is literally no evidence of sales, advertising or any public recognition of opposer's mark in connection with magnets, postcards, posters and clothing. As for opposer's musical

---

[11] There has been some discussion, in both applicant's motion to dismiss and in opposer's brief, about applicant having filed a foreign application and/or based its application on a foreign registration under the provisions of the Madrid Protocol. There is no evidence regarding such a filing in the record, and the application which is the subject of this proceeding was filed under Section 1(a) of the Trademark Act, based on use in commerce, and not claiming any benefits or rights under the Madrid Protocol.

sound recordings, there is limited evidence of a couple of television advertisements, but no evidence as to sales of recordings, nor of advertising expenditures, nor of any impact on or recognition by the public of the mark for such goods.

We also point out that we are considering the fame of the word mark BLUE MAN GROUP, not whether the distinctive appearance of the performers is recognized or famous. Thus, the video segment from the television show "The Simpsons" where, in the opening sequence, cartoon characters with hairless blue heads are sitting on a couch, but in which the words "Blue Man Group" are not mentioned, is not evidence of fame of the mark. Nor is a segment from the "Early Today" show about Intel's advertising campaign, in which the mark is never used, but the performers are referred to throughout as "The Blue Men." As for the television commercials for Intel Pentium processors, although the performers are prominently featured, the words BLUE MAN GROUP appear in relatively small letters in a corner of the screen for just a few seconds; as a result, these commercials do little to show fame of the word mark. The mark that is being advertised is clearly PENTIUM, and it is not clear to what extent viewers would even notice, let alone remember, the word mark BLUE MAN GROUP in these commercials. As an additional point, although opposer's witness has testified

about the millions of dollars spent by Intel to buy media time for these commercials, there is no evidence about the number of times the commercials were shown. It appears that one reason for the high costs for this advertising is that Intel has chosen to run these commercials on programs, including the Super Bowl, where air time is very expensive. But as the Court specifically pointed out with respect to commercials during the Super Bowl, "a 30-second spot commercial shown during a Super Bowl football game may cost a vast sum, but the expenditure may have little if any impact on how the public reacts to the commercial message." Bose Corp. v. QSC Audio Products Inc., 293 F.3d 1367, 63 USPQ2d 1303, 1309 (Fed. Cir. 2002).

Normally we look to the volume of sales and advertising expenditures for the goods and services sold under the mark, and by the length of time those indicia of commercial awareness have been evident, in order to measure the fame of a mark. Id. Here, opposer has provided no evidence of the volume of its sales or of its advertising expenditures. Although we accept that the flyer advertising a "happening" in 1988 is evidence of opposer's use of BLUE MAN GROUP for performing services, opposer has provided no clear evidence about the extent of its use of the mark, or its sales under the mark, since that date.

What we do have are the articles, Internet materials and television clips that refer to the BLUE MAN GROUP performers, and to entertainment services rendered under the mark. As previously discussed, many of these articles have no or very little probative value. We have already said that many of the articles made of record by opposer mention the mark BLUE MAN GROUP only in passing. We are reminded by the diligence of opposer's clipping services of a statement made by the Court of Appeals for the Federal Circuit in another context: "It is indeed remarkable to see the thoroughness with which NEXIS can regurgitate a placename casually mentioned in the news." In re Societe Generale des Eaux Minerales de Vittel S.A., 824 F.2d 957, 3 USPQ2d 1450, 1451 (Fed. Cir. 1987). Opposer's clipping services appear to be equally thorough in finding all mentions of or references to BLUE MAN GROUP, whether it be the mark or the performers. For example, an article in the August 19, 2002 "People" magazine about Moby and David Bowie and their summer tour mentions, in a parenthetical, "The eclectic bill includes Blue Man Group and rapper Busta Rhymes"; a September 6, 2002 article in "The New York Times" discussing many programs commemorating 9/11 contains the sentence, "In tribute to the victims of the 9/11 attacks, Blue Man Group has created an eloquent video."

In addition, some of the publications appear to be of limited circulation or are trade publications or are directed to specific audience segments, such that they are not likely to be seen by large numbers of the general public.  These include "The Calvin Spark, The Magazine for Alumni and Friends of Calvin College"; "FSB Fortune Small Business"; "Ad Age"; "DVD WORKS The Art and Science of DVD Production"; "Brandweek"; "Picture Framing Magazine"; and "American Cemetery."  We consider these articles to be of extremely limited value in proving the fame of opposer's mark.

Quite a number of the remaining articles, many of which are about or prominently feature the BLUE MAN GROUP performers and their performances under the mark, are from periodicals from Las Vegas, and are about the BLUE MAN GROUP show in that city.  The publications include specialty entertainment magazines such as "NEON The Las Vegas Guide to Entertainment"; "Las Vegas Weekly"; "What's On The Las Vegas Guide"; "Today in Las Vegas" and "Las Vegas City Life."  There are similar groups of articles from periodicals located in Chicago, Boston and New York and their respective surrounding areas that discuss the BLUE MAN GROUP show being performed in those cities.  Although people living or visiting in these cities during the time the articles ran, and who were interested in the entertainment opportunities

21

available at those times, may have been exposed to the articles, they do not show general recognition of the mark BLUE MAN GROUP.

We acknowledge that opposer has made of record articles from national publications as well as from newspapers located around the country, from Pittsburgh, PA to Savannah, Georgia to San Diego, CA. Some of these articles feature the BLUE MAN GROUP performances, while others simply mention the mark in passing. For example, BLUE MAN GROUP is the subject of a cover story in the Sunday Calendar section of the March 4, 2001 "Los Angeles Times," and is also the subject of articles in the November 17, 1991 "New York Times," the July 11, 2003 "Observer-Reporter" (Washington, PA), the May 16, 2003 "Record" (Hackensack, NJ) and the May 7, 2003 "Cherokeean/Herald" (Rusk, TX). On the other hand, there is a food recipe article in the September 16, 2001 issue of the "The New York Times" about the color blue as it relates to food in which the group is pictured, but there is only a brief reference to the mark.

Evidence of national magazines that feature the performers or performance services is rather limited. For example, there is an article in the July 24, 2000 "Time" magazine about BLUE MAN GROUP playing at a theater in Las Vegas. Mere mentions include the April-May 2002 issue of "Bride's Magazine" which, in an article on honeymoons in Las

22

Vegas, includes the sentence, "Elvis impersonators are competing for arena space with cutting-edge acts like Blue Man Group, while all-you-can-eat buffets vie with a cadre of celebrity chefs for visitors' palates." There are also some articles in national magazines from the early 1990s, e.g., a "Vanity Fair" two-paragraph article, with photo, in April 1991; a July 20, 1992 travel section article in "Business Week," discussing dining and show options in New York which includes a photo of the performers and a mention of the BLUE MAN GROUP show; and an article in the January 20, 1992 issue of "Time" magazine about the group and their performances.

The BLUE MAN GROUP entertainment services have received exposure through television appearances or mentions on television programs. Many of the video clips that opposer has submitted are of local news broadcasts, including segments about INTEL, its financial position and its new advertising campaign. Although the BLUE MAN GROUP performers are shown in these broadcasts, the mark itself is mentioned only briefly. There have also been some nationally broadcast programs. Some, again, contain only mere mentions of the mark, for example, an appearance by the performers on the Sunday "Today" show of December 22, 2002, where they are seen very briefly standing outside the studio handing out toys to the gathered audience, and during which the mark BLUE MAN GROUP is mentioned only once. However,

some of the national television appearances are more significant. These include opposer's appearances at the 2001 Grammy Awards show, on the "Drew Carey Show" and on "The Tonight Show." Opposer performed at the Grammy Awards show with Jill Scott and Moby. Various local newscasts about the show stated that BLUE MAN GROUP had been nominated for an award in the Best Pop Album Instrumental Category, although according to the newscasts opposer did not win. On a live telecast of the "Drew Carey Show" which aired on November 29, 2001, the performers, dressed in their characters as BLUE MAN GROUP, played featured roles, and the mark and their theater performances were mentioned as part of the story. Opposer also appeared on "The Tonight Show" eleven times between 1992 and 2003 (twice in 1992, once each in 1993, 1994, 1997, 1999 and 2000, and four times in 2003), where it gave its musical/comedic/theatrical performances under the mark BLUE MAN GROUP.

Thus, there are a number of articles that show opposer and its performances under the mark BLUE MAN GROUP have received publicity, particularly in the cities where opposer has performed. The performances and the mark have also received some national exposure, particularly through the group's appearances on such programs as the "Tonight Show" and the "Grammy Award" show, as well as exposure in various cities throughout the country through articles that have

24

appeared in different newspapers and mentions on local television news broadcasts.

While opposer has certainly submitted a large number of articles and other materials, when unacceptable material, duplicative material, and material with no real probative value is removed, the amount of evidence showing recognition of opposer's mark is far less than the eleven-page listing in opposer's notice of reliance would lead one to expect. From the probative evidence, we conclude that BLUE MAN GROUP has achieved a degree of recognition as a mark for entertainment services, such that the mark would be viewed as a strong and distinctive mark, and not be considered only as highly suggestive of performance services rendered by a group of men who are colored blue.

However, we cannot find on this record that consumers have been so exposed to the mark BLUE MAN GROUP, or that they are so aware of it, that it can be considered a famous mark. Certainly the evidence of fame in this record is much less compelling than that compiled in other cases where marks have been found to be famous. See Bose Corp. v. QSC Audio Products Inc., supra, and examples given therein. In this respect, the situation is similar to that in Hard Rock Cafe Licensing Corp. v. Elsea, supra at 1409, in which the opposer also submitted only printed publications in its attempt to prove the fame of its mark, and in which the

Board stated that "opposer failed to properly introduce any specific evidence regarding the nature and extent of its promotion of its mark in connection with its products and services, U.S. sales figures, advertising and other promotional expenditures or evidence regarding the reputation of opposer's mark to the relevant purchasing group."

The Court confirmed, in Packard Press Inc. v. Hewlett-Packard Co., 227 F.3d 1352, 56 USPQ2d 1351, 1356 (Fed. Cir. 2000), the importance of evidence such as sales figures and promotional expenditures in terms of proving the fame of a mark:

> We hold that the Board correctly declined to consider the fame factor. Our caselaw has consistently stated that the conclusion that a mark is famous is based on several important factual findings. *See DuPont,* 476 F.2d at 1361, 177 USPQ at 567 (indicating that the sales, advertising, and length of use of the mark are to be considered when evaluating the fame of the mark); *Recot*, 214 F.3d at 1326, 54 USPQ at 1896 (describing relevant evidence of record supporting conclusion that the FRITO-LAY mark is famous). That the fame factor is based on underlying factfinding dictates that relevant evidence must be submitted in support of a request for treatment under the fame factor. This responsibility to create a factual record is heightened under the more deferential standard that this court must apply when reviewing PTO factfinding. *See Zurko*, 527 U.S. at 165, 50 USPQ2d at 1937; *Gartside*, 203 F.3d at 1315, 53 USPQ2d at 1775. This

> is because judicial review under the substantial evidence standard, *see Gartside,* 203 F.3d at 1314, can only take place when the agency explains its decisions with precision, including the underlying factfindings and the agency's rationale. This necessarily requires that facts be submitted to the agency to create the record on which the agency bases its decision. Because HP did not proffer such evidence in support of its argument that its marks are famous, the Board properly declined to address this issue.

In view of the extreme deference that is accorded to a famous mark in terms of the wide latitude of legal protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, we think that it is the duty of a plaintiff asserting that its mark is famous to clearly prove it. Although opposer has shown that its mark has achieved some recognition for musical/comedy/theatrical performance services, the evidence of record is insufficient to support a finding that the mark is famous. Thus, we find that the factor of the strength of the mark favors opposer, but not to the extent that it would if the mark were truly famous.

Even if opposer had proved that its mark is famous for entertainment services, the factor of fame alone is not sufficient to establish likelihood of confusion. If that were the case, having a famous mark would entitle the owner to a right in gross, and that is against the principles of trademark law. See University of Notre Dame du Lac v. J. C.

27

Gourmet Food Imports Co., Inc., 703 F.2d 1372, 217 USPQ 505, 507 (Fed. Cir. 1983):

> The fame of the [plaintiff's] name is insufficient in itself to establish likelihood of confusion under § 2(d). "Likely * * * to cause confusion" means more than the likelihood that the public will recall a famous mark on seeing the same mark used by another. It must also be established that there is a reasonable basis for the public to attribute the particular product or service of another to the source of the goods or services associated with the famous mark. To hold otherwise would result in recognizing a right in gross, which is contrary to principles of trademark law and to concepts embodied in 15 USC § 1052(d).

See also Recot Inc. v. M.C. Becton, 214 F.3d 1322, 54 USPQ2d 1894, 1898 (Fed. Cir. 2000) ("fame alone cannot overwhelm the other du Pont factors as a matter of law").

In this case, we find that the differences in the goods, as well as the different commercial impressions engendered by the marks, are significant countervailing factors. See Burns Philp Food Inc. v. Modern Products Inc., 24 USPQ2d 1157 (TTAB 1992), aff'd unpub op. 1 F.3d 1252, 28 USPQ2d 1687 (Fed. Cir. 1993).

Turning to the goods and services, there are clear and significant differences between applicant's goods, tobacco and cigarettes, and the various goods and services identified in opposer's registrations, i.e., musical recordings, magnets, postcards, posters, hats, T-shirts,

sweatshirts, and musical and theatrical performances.  In particular, there are significant differences between applicant's goods and the entertainment services for which opposer contends that its mark is famous.  Opposer has asserted in its brief that cigarettes and opposer's goods and services are complementary, but has submitted no evidence in support of such a statement.  Opposer states that it features cigarette lighters as the focus of a segment in its current production, but again, there is no evidence of this in the record.  (As we stated previously, articles may not be used to prove the truth of the matters asserted therein, as that would constitute reliance on hearsay.)  Nor has opposer submitted evidence of what it characterizes as an "unusual 'empire' or 'franchise' of products and services with which [opposer] has been associated."  Brief, p. 16.  The fact that opposer's performers are seen in Intel commercials does not create an "empire" or "franchise"; it does not even make opposer a franchisor of its mark for Intel's computer chips.  And the fact that opposer has registered its mark for magnets, post cards, posters and clothing items does not demonstrate that consumers are likely to believe that opposer sponsors or has licensed the use of its mark for cigarettes or tobacco.  The present situation is different from that in McDonald's Corp. v. McClain, 37 USPQ2d 1274 (TTAB 1995), cited by opposer, in

29

which the Board found that, in view of the fact that McDonald's used and licensed its marks on a wide variety of goods and services, consumers were likely to believe that McDonald's was connected with applicant's legal services. Here, on the other hand, opposer has not shown that it has a history of licensing, or that it has done any licensing at all. Nor has opposer even shown that cigarettes or tobacco are products for which owners of merchandising marks would license their marks.

We recognize that, when a mark is famous, the degree of relatedness of the goods need not be as great. We also recognize that, even if the goods in question are different from, and thus not related to, one another in kind, the same goods can be related in the mind of the consuming public as to the origin of the goods. See Recot Inc. v. M.C. Becton, 214 F.3d at 1329, 54 USPQ2d at 1898. However, there must be something more than just a similarity of marks to show this relatedness or, again, the owner of a famous mark would have a right in gross. Therefore, even if opposer had been able to establish that its mark is famous, opposer has simply failed to show any relatedness as to origin of cigarettes or tobacco and opposer's performing services or its other goods. Because there is no evidence that opposer licenses its marks at all, or that other companies license, for use on cigarettes and tobacco, marks that are used for

30

entertainment services and on such goods as posters, clothing, magnets and sound recordings, opposer has not proven that cigarettes or tobacco would be related to its goods and services in the mind of the consuming public. Thus, the factor regarding the similarity or dissimilarity of the goods favors applicant.

This brings us to a consideration of the marks. We agree with opposer that the marks are very similar in appearance and pronunciation, differing essentially only in that opposer's mark has the additional word GROUP, and depicts BLUE MAN as two words rather than one. In terms of meaning, opposer's live musical and theatrical performances feature three men whose heads and hands (the only parts of their bodies that show) are a shade of bright blue. When opposer's mark is viewed in connection with these services, the mark obviously refers to these performers, and the fact that each person in this group is a "blue man." As for the musical recordings, the commercials and advertisements for these recordings prominently feature the blue-headed performers, such that, with respect to the recordings, too, the mark BLUE MAN GROUP has the connotation of the appearance of the performers. On the other hand, applicant's mark has no such connotation for cigarettes or tobacco. Thus, the marks differ in their connotations and

31

commercial impressions.[12]  We consider these differences in the connotations and the commercial impressions of the marks to outweigh the visual and phonetic similarity.  As a result, this factor favors applicant.

Opposer asserts that the parties' goods and services travel through the same channels of trade but, again, has submitted no evidence to support this claim.  We agree with opposer that there are no restrictions as to the channels of trade for the goods and services identified in opposer's registrations and applicant's application, and that they must be assumed to travel in all of the normal channels of trade for such goods and services.  However, it is not apparent to us from merely viewing the identifications that the normal channels of trade for the sale of cigarettes or tobacco are the same as the channels of trade for live musical and theatrical performances, or for magnets, posters, postcards and clothing.  Opposer also states that "the Board can take notice that many of the national publications which prominently featured articles about Opposer … also run advertisements for cigarettes and other

---

[12]  As for opposer's identified goods, with the exception of the musical recordings, there is no evidence in the record as to how the goods appear, so the mark BLUE MAN GROUP may not have the same connotation as it does for the entertainment services and recordings when it is used for these other goods.  However, even if the parties' marks had the same connotation, because there is no evidence whatsoever that opposer has achieved any recognition for its mark for these other goods, the differences in the goods themselves is sufficient to avoid any likelihood of confusion.

tobacco products." Brief, p. 22. However, we have found no such advertisements in opposer's submissions, and we decline to take judicial notice as to whether specific magazines or newspapers carry cigarette ads. In any event, the fact that a cigarette ad may appear on one page of a magazine or newspaper, far removed from any article referencing opposer's mark and services, is not sufficient to demonstrate that readers/consumers would be exposed to both the goods and services under circumstances that would give rise to the mistaken belief that they originate from the same producer. See International Telephone & Telegraph Corp., 197 USOQ 910, 911 (TTAB 1986). The factor of the channels of trade favors applicant.

Opposer has not discussed any of the other du Pont factors, so we will not burden this opinion with an exhaustive discussion of them. Briefly, there is no evidence of third-party use of similar marks, so this factor favors opposer. There is also no evidence of actual confusion, but because we have no information regarding the nature or extent of applicant's use, we consider this factor, and the related factor of use without evidence of confusion, to be neutral. The class of consumers for the parties' goods and services must be considered, in part, to be the same, in that both may be marketed to and purchased

by adult members of the general public.  This factor favors opposer.

Opposer has also asserted that "where there is evidence of an applicant's intent to adopt a mark to benefit from the goodwill of an already successful mark, this factor weighs toward a likelihood of confusion."  Brief, p. 18.  However, opposer has not submitted any evidence that this was applicant's intent in adopting its mark.  We cannot infer a bad intent merely from the fact of applicant's adoption of a mark with some similarity to opposer's mark.

Opposer is correct that any doubt as to whether confusion is likely must be resolved against the newcomer.  However, the burden still rests with the opposer to prove its case.  Based on the record herein, and considering all the du Pont factors on which there is evidence, we find that opposer has failed to establish that applicant's use of BLUEMAN for cigarettes or tobacco is likely to cause confusion with opposer's mark BLUE MAN GROUP for its identified goods and services.  We have no doubt on this issue, and thus the presumption for resolving doubt does not come into play.

## Dilution

The second ground asserted by opposer is that of dilution.  Section 43(c)(1) of the Trademark Act, 15 U.S.C. § 1145, provides that "The owner of a famous mark shall be

34

entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection." This ground is made available for opposition proceedings by Section 13(a) of the Act, 15 U.S.C. § 1063(a). As set out in the Act itself, and as interpreted by case law, one of the factors to be considered in determining whether dilution has been proven is whether the opposer's mark is famous. See Toro Co. v. ToroHead Inc., 61 USPQ2d 1164 (TTAB 2001).

The operative date by which opposer must prove its mark became famous is August 6, 2001, which is the filing date of applicant's application. In Toro Co. v. ToroHead Inc., supra at 1174, the Board held that in the case of an intent-to-use application, an owner of an allegedly famous mark must establish that its mark had become famous prior to the filing date of the trademark application or registration against which it files an opposition or cancellation proceeding. In the present case, we note that applicant's application is based on use (Section 1(a) of the Act), rather than on an intention to use the mark, as was the situation in the TORO case. However, because applicant has

not submitted any evidence of his use, it is consistent with the analysis set out in TORO, as well as case law involving a determination of priority, to treat the filing date of applicant's application as the date of his first use and/or constructive use of the mark.  See Levi Strauss & Co. v. R. Josephs Sportswear Inc., 36 USPQ2d 1328 (TTAB 1994) and cases cited therein.  Accordingly, in our determination of whether opposer has proven dilution, much of the evidence submitted by opposer can be given no consideration because it consists of printed materials dated after August 6, 2001, and copies of television broadcasts which aired after that date.

Fame for likelihood of confusion purposes and fame for dilution purposes are distinct concepts.  Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005).  A mark may have acquired sufficient public recognition and renown to demonstrate that it is a strong mark for likelihood of confusion purposes without meeting the stringent requirements to establish that it is a famous mark for dilution purposes.  Toro Co. v. ToroHead Inc., supra at 1170.

We have already found that opposer has failed to prove that BLUE MAN GROUP is a famous mark in our likelihood of confusion analysis.  Therefore, given the stricter standard

36

required to prove fame in order to obtain protection under the dilution statute, and given that all articles and television broadcasts and other evidence dated after August 6, 2001 cannot be considered as evidence of fame, it is clear that opposer has not proven that BLUE MAN GROUP is famous for dilution purposes.

Accordingly, we find that opposer has failed to establish its claim of dilution.

Decision:  The opposition is dismissed on both the ground of likelihood of confusion and the ground of dilution.